UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CHESTER KIDD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AIRBORNE EXPRESS, INC. a/k/a | ) Case No. 3:04-0768 |
| AIRBORNE FREIGHT CORP. and | ) Judge Echols |
| DHL EXPRESS (USA), INC. a/k/a | ) |
| DHL WORLDWIDE EXPRESS, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Pending before the Court is the Motion for Summary Judgment filed by Defendants Airborne Express, Inc. and DHL Express (USA), Inc. (collectively "Defendants" or "Airborne Express") (Docket Entry No. 14) to which Plaintiff Chester Kidd ("Kidd") has responded in opposition (Docket Entry No. 25) and Defendants have replied (Docket Entry No. 29).

### I. FACTS

Kidd, an African American, was terminated as an independent contractor for Airborne Express.[1] He subsequently filed suit in this Court under 42 U.S.C. § 1981 claiming the termination was because of his race. Construed in Kidd's favor, the facts underlying his claim are as follows.

Airborne Express is in the business of express letter and parcel delivery. It has locations throughout the United States,

---

[1] Both Airborne Express and DHL are named as Defendants. Deutsche Post World Net acquired DHL and then Airborne Express. Those companies now operate under the name DHL. (York Depo. at 8).

1

many of which use independent contractors who pick up and deliver the letters and parcels to and from homes and businesses. Airborne Express' Nashville station is among those which utilize independent contractors for its courier services. (York Depo. at 9-10).

For several months in 2001, Kidd worked for KAR Courier, an independent contractor for Airborne Express at its Nashville facility. Upon hearing that bids would be taken for a contract Airborne Express had with Asurion, a wireless technology company, Kidd decided to start his own business in the air freight industry. He submitted a bid and won the Asurion contract for his corporation which he named Morning Star Trucking, Inc. ("Morning Star"). (Id. ¶ 3 & York Depo. Ex. 3).

The terms of compensation for independent contractors are set forth in a cartage agreement and accompanying schedule. Generally, independent contractors are paid a base rate per each item handled up to a certain specified number of items (the threshold rate). After the threshold rate is met, the independent contractors are paid a lower rate for each additional item handled. There is also a premium paid for heavy and/or oversized items. (York Depo. at 26-28).

The initial negotiation for the price fixed in the cartage agreement is between the independent contractor and the District Field Manager. The proposed rate is then forwarded to "IC Relations" for review which in turn may refer the proposal to field engineers. Once someone in "IC Relations" approves the agreement, it is sent to corporate for final approval. (York Depo. at 40-44).

On September 23, 2001, Kidd, on behalf of Morning Star, entered into a cartage agreement with Airborne Express for servicing the Asurion account. (York Depo. Ex. 2). Pursuant to that agreement, Morning Star was to maintain general liability insurance coverage of no less than one million dollars per occurrence and automobile liability coverage of at least the same amount on all "owned, non-owned and hired vehicles." (Id. ¶ 15(b)). The insurance was to be provided by a carrier which had a "general policyholder's rating of not less than B+ and financial rating of not less than VIII in the most current Best's Insurance Reports." (Id. ¶ 15(c)).

Under Schedule A to the cartage agreement relating to Asurion, Morning Star was to receive a base rate per shipment of 20¢ per parcel. The expected number of parcels per week was 10,000, meaning that Morning Star would receive approximately $2,000 per week for servicing the Asurion account. For each item above the 10,000 threshold, Morning Star was to receive 1¢.

Initially, the Asurion account produced approximately 2,000 parcels or letters a day. However, that rapidly increased and eventually grew to 7,000 or 8,000 a day. Because of this increase, Kidd sought to renegotiate his cartage agreement beginning in March, 2002. (Kidd Aff. ¶ 5 & York Depo. at 45).

Kidd negotiated with Nashville District Field Service Manager James York. (Id. & York Depo. at 10-12). Kidd suggested that his company should be compensated at a rate of $6,000 per week for the Asurion account. York countered with $3,100 per week, causing Kidd

3

to drop his demand to around $4,000 per week. (Kidd Aff. ¶ 5, York Depo. at 48-49). At some point during the negotiations, York allegedly told Kidd "I am tired of dealing with you people." (Kidd Aff. ¶ 6).[2] In any event, Kidd ultimately decided to accept the $3,100 per week figure and communicated that acceptance to York by letter dated November 12, 2002. (York Depo. Ex. 2).

Although York had proposed $3,100 as a counter-offer to Kidd's requested $6,000 per week, that proposal was denied by corporate. It originally denied the request in December, 2002 after having the situation reviewed by field engineers. York did not tell Kidd about the denial at that time because he was still trying to see if he could get approval. (Id. at 52-54). In fact, York corresponded and spoke about the situation with Alex Tagart who was in Airborne's Cartage Contracting & Administration Department and who was responsible for reviewing the cartage contracts for Nashville. York also spoke with his supervisor Pat McDowell, Airborne's Regional Supervisor in Atlanta. ( Id. at 10-12, 46, 49-58). Despite those efforts, the increase to $3,100 was never approved. (Id. at 57).

Kidd claims that he continued to wait for the $3,100 increase to take effect. He also claims that for a period of six months he was repeatedly assured by York that the increased amount would go into effect and that he would receive a check reflecting the

---

[2] In his deposition, Kidd also testified that during negotiations or discussion about accounts, York was prone to using profanity. Kidd admitted, however, that he cursed when dealing with white contractors as well. (Kidd Depo. at 41-44).

4

change. That never occurred and instead, in May 2003, Airborne offered to increase the rate to $2,800 per week. (Kidd Aff. ¶ 5).

In addition to the Asurion account, Kidd received a contract for the Hollywood Video account in LaVergne, Tennessee. He assumed that contract sometime in February or March of 2002. Airborne Express began to receive complaints from Hollywood Video about the service being provided and Kidd was made aware of those complaints on several occasions between October 2002 and January 2003. Kidd maintains that the complaints involved Hollywood Video's request that their items be picked up in trucks bearing Airborne Express logos while Defendants contend the complaints centered around Morning Star's alleged lack of resources and inability to adequately service the account. (Kidd Depo. at 17-19; McDowell Aff. ¶ 5; York Aff. ¶ 4). The Hollywood Video account was transferred to another independent contractor, KAR Courier, sometime around January 2003. (Kidd Depo. at 18).

In June 2003, an e-mail was distributed to the independent contractors reminding them of the required insurance provisions in their cartage agreements and identifying the rating required for carriers. The e-mail specifically noted that Lincoln General did not meet the required ratings. Prior to receipt of the e-mail, Kidd had been informed by York there was some problem with Morning Star's insurance, although York was not familiar with the details. (Kidd Depo. at 50-51 & Ex. 3).

At the time the e-mail was distributed and for many months prior thereto, Morning Star's insurance was underwritten by Lincoln

5

General.  That policy did not provide coverage for "all owned autos."  (Kidd Depo. Ex. 2).[3]

On July 1, 2003, Tagart sent an e-mail to McDowell, York and others soliciting their views on terminating Morning Star as an independent contractor since no agreement had been reached regarding the Asurion account and since Morning Star's insurance coverage did not comply with the cartage agreement's requirements. All agreed to the termination, although McDowell asserts that he was the ultimate decision maker regarding the termination.  (Kidd Depo. Ex 3 & McDowell Aff. ¶ 12).

McDowell asserts that the decision to terminate the cartage agreement with Morning Star was because Morning Star's insurance did not comply with the cartage agreement and because another cartage contractor was willing to assume the Asurion contract for a significantly lower rate than that demanded by Kidd.  (McDowell Aff. ¶ 13).  On July 2, 2003, Tagart sent Kidd a letter giving him sixty days written notice of the termination of Morning Star's cartage agreement.  (York Depo. Ex. 2).  The Asurion account was awarded to KAR Courier which had a significantly longer track record working with Airborne Express than Morning Star and which agreed to assume that account at a rate of $2,800 per week.  (Id. & Kidd Depo. at 25-27).

---

[3]From January 26, 2002, through September 11, 2002, Morning Star operated without any commercial auto insurance coverage. (Kidd Depo. at 72-73).  However, it does not appear that Airborne Express became aware of that fact until after the filing of this lawsuit.  (See, Docket Entry No. 16 at 5).

During the time period relevant to this litigation, seven independent contractor firms worked out of the Nashville station. (Id. at 13). Except for Morning Star, none of those firms were owned by African Americans, although there were many on-site managers who were African American. (Id. at 72-73).

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving

7

party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  LEGAL ANALYSIS

Section 1981 of Title 42 provides in relevant part that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  Sixth Circuit precedent dictates that "[t]he elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981."  Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004) (citations and internal quotation marks omitted).  A claim of discrimination may be established either by the introduction of direct evidence of discrimination, or by circumstantial evidence from which an inference of discrimination may be drawn.  Johnson v. Kroger Co., 319 F.3d 858, 864-65 (6th Cir. 2003).

**A.**  *Direct Evidence*

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Jacklyn v.

8

Shering-Plough Healthcare Prods. Sales Corp., 176 F.2d 921, 926 (6th Cir. 1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson, 319 F.3d at 865. Moreover, "[i]t is well established that isolated and ambiguous comments are not sufficient to make out a direct-evidence case of employment discrimination." Weigel v. Baptist Hosp. Of East Tennessee, 302 F.3d 367, 382 (6th Cir. 2002).

In this case, Kidd has no evidence which could be viewed as direct evidence of discrimination.[4] The only thing even remotely resembling direct evidence is his contention that York stated, "I am tired of dealing with you people." Such a vague statement does not constitute direct evidence of discrimination since it requires an inference to be drawn in order to prove the existence of a fact (i.e. unlawful discrimination). Kocak v. Community Health Partners of Ohio, Inc., 400 F.3d 466, 470-71 (6th Cir. 2005); Vredevelt v. GEO Group, Inc., 2005 WL 1869607 *5 (6th Cir. 2005). "You people" could mean any of a number of things and, as Kidd himself admitted, could have been a reference to truck drivers, cartage contractors, or Democrats and Republicans. (Kidd Depo. at 38).

---

[4]Kidd comes close to admitting as much by stating in his affidavit "I have no direct evidence of anyone admitting racial discrimination." (Kidd Aff. ¶ 9). His brief in opposition to Defendants' Motion for Summary Judgment only attempts to establish an indirect case of discrimination.

9

Moreover, the only evidence before the Court suggests that McDowell was the ultimate decision maker and there is no suggestion he was aware of, let alone endorsed, York's alleged comment. Hussain v. Highgate Hotels, 126 Fed. Appx. 256, 262 (6th Cir. 2002)(direct evidence is used to show "that the person who made the challenged decision, or was otherwise meaningfully involved in that decision, had a bias or that bias affected the challenged decision"). Finally, the statement does not appear to have been made anywhere near in time to the termination of Morning Star's contract[5] and hence there is no temporal link between the alleged statement to Kidd and the termination of the cartage agreement. See, Das v. Ohio State Univ., 57 Fed. Appx. 675, 678-79 (6th Cir. 2003)("Merely vague, ambiguous, or isolated remarks by a company agent which were not related to the decision-making process and were not made proximate to the assailed adverse employment action cannot constitute sufficient direct evidence of outlawed employment discrimination").

Because the alleged comment by York does not compel the conclusion that Airborne Express' decision to terminate the cartage contract with Morning Star was motivated by discrimination based on Kidd's race, Kidd has not shown direct evidence of discrimination.

---

[5]Exactly when the statement was purportedly made is unclear from the record although it is alleged to have been made during negotiations. Negotiation apparently occurred up until December 2002, but the contract was not terminated until the following August.

10

Accordingly, the Court turns to the evidence which Plaintiff has adduced in an effort to establish a circumstantial case.

**B.   *Circumstantial Evidence***

To establish a circumstantial evidence case under Section 1981, Plaintiff must initially establish a *prima facie* case of discrimination by showing (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) he suffered an adverse employment action, and (4) he was replaced, or treated less favorably, than one outside the protected class.  See, Sutherland v. Mich. Dept. of the Treasury, 344 F.3d 603, 614 (6th Cir. 2003). If a *prima facie* case is established, the burden shifts to the Defendants to offer a legitimate non-discriminatory reason for the employment action.  Id.  If the Defendants meet this burden, the burden of production shifts back to the Plaintiff to demonstrate that the proffered reason is a pretext.  Id.

In this case, Defendants do not dispute that Kidd is a member of a protected class, nor do they dispute that termination of the cartage agreement was an adverse action.  Instead, their argument is that Kidd has failed to show that he was qualified to continue as an independent contractor or that he was treated differently from others.  This Court agrees.

The cartage agreement required that independent contractors have automobile liability insurance covering the use of owned, non-owned, and hired vehicles.  It also required that the policyholder's rating be not less than a B+ with a financial rating of not less than VIII.  Plaintiff's insurance did not meet those

11

requirements because the insurer had a rating of only VII and the insurance did not cover owned vehicles.

Without question, a company in the business of entrusting its customers' goods with independent contractors has a legitimate interest in protecting those goods. In this case, Airborne Express sought to protect those goods by requiring its independent contractors to maintain a certain level of insurance coverage issued by an acceptable carrier. Kidd has not shown, nor does he even suggest, that this is not a legitimate concern of Airborne Express. Nor has he shown or argued that those requirements were not a part of the cartage agreement which he willingly signed in order to become an independent contractor for Airborne Express.

Aside from failing to show he was "qualified" in the sense that he had the required insurance, Kidd has failed to show that he was treated differently than others. There is not a scintilla of evidence that Airborne Express allows some, but not others, to have inferior insurance coverage, let alone that the difference in allowable coverage is somehow related to race.[6]

Yet even if it is assumed that Kidd can establish a prima facie case of discrimination, he cannot show that the legitimate non discriminatory reasons for his losing the cartage agreement was pretextual. "A plaintiff can demonstrate pretext by showing that

---

[6]Although not argued in his brief, in his deposition, Kidd asserted that other couriers, including KAR, utilized the same broker as he in obtaining insurance. Even if this is true, it establishes nothing since brokers often write for different insurers and since there is absolutely no evidence that KAR had insurance which did not meet the terms of the cartage agreement.

12

the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dew v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).

Turning first to the Hollywood Video account, Kidd makes no argument regarding pretext. This may be because in his deposition Kidd admitted he had no idea what criteria the decisionmaker utilized in deciding to transfer the account to KAR. (Kidd Depo. at 22). Moreover, even if, as Kidd believed, Hollywood Video wanted its packages picked up by vehicles bearing Airborne Express' logo, this does not in any way suggest that the account was transferred on the basis of race.

With regard to Defendants' assertion that Kidd was terminated as an independent contractor because Morning Star had insurance that did not comply with the cartage agreement's requirements, Kidd asserts this is false. In support of that contention, Kidd argues that upon receiving the e-mail advising him of the deficient coverage he contacted his agent who then faxed Airborne Express documents identifying the change in his coverage. He heard nothing further and claims that it was not until depositions in this case that he learned that among the reasons for Morning Star's termination was inadequate coverage.

Even if Kidd changed his coverage, it is clear beyond doubt that the coverage he obtained did not meet the requirements of the cartage agreement. In fact, the e-mail, which he acknowledges receiving, specifically stated that his insurer - Lincoln General -

13

was not acceptable. As for Airborne Express not indicating until later that inadequate insurance coverage was a reason for termination of the cartage agreement, this does not mean that the reason was false. Quite the contrary, Tagart's initial e-mail to fellow Airborne Express employees cited insufficient coverage as a basis for termination. The fact that Kidd may not have learned of this until later does not in any way suggest racial discrimination at the time the decision was made. See, Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)(focus is on whether the employer reasonably relied on the particularized facts before it at time decision was made).

Kidd also claims that Airborne Express' contention that he did not negotiate is false. In this regard, Kidd contends that he did negotiate and that the negotiations stopped only after York misrepresented to him that the $3,100 offer would be acceptable. (Docket Entry 25 at 5). This argument, however, misconstrues Airborne Express' contention.

Airborne Express is not arguing that Plaintiff did not negotiate in good faith. Its argument is that in spite of the negotiations, no accord was reached and that it was only after a protracted period that Airborne Express sought another independent contractor to take over the Asurion account.

Regardless, even if Airborne Express failed to negotiate, that might support a claim for breach of contract. But Section 1981

14

requires more - it requires that the failure to contract was because of race. Kidd has presented no such evidence.[7]

To show Airborne Express' proffered reasons did not actually motivate termination of the cartage agreement, Kidd has to "show[] circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994)(emphasis in original). "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." Id.[8]

Here, after considering Kidd's limited circumstantial evidence, both singularly and as a whole, the Court must conclude no jury question exists as to whether Airborne Express' stated reason for terminating Morning Star's cartage agreement was a

---

[7] Kidd asserts that there were no other African American owned independent contractor companies working out of the Nashville facility. This circumstantial evidence is of limited weight since Kidd has presented absolutely no evidence that there were other African American owned courier services qualified to work as independent contractors for Airborne Express, or that any of those entities ever expressed any desire to enter into a cartage agreement with Airborne Express.

[8] McDowell states that he was the decisionmaker both with regard to the Hollywood Video account and the termination of the cartage agreement. Interestingly enough, even though Kidd claims his photograph appeared on the security badge computer records which were available to corporate personnel, McDowell claims he did not know Kidd was African American until after this lawsuit was filed. (McDowell Aff. ¶¶ 12, 15; Kidd Aff. ¶ 7).

15

coverup for discrimination. As such, summary judgment on Kidd's claim of discrimination under 42 U.S.C. § 1981 must be granted.

## IV. CONCLUSION

On the basis of the foregoing, the Motion for Summary Judgment filed by Defendants Airborne Express, Inc. and DHL Express (USA), Inc. (Docket Entry No. 14) will be granted and this case will be dismissed.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE